**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PERFECT 10, INC.,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>GIGANEWS, INC.; LIVEWIRE<br>SERVICES, INC.,<br>*Defendants-Appellees.* | No. 15-55500<br><br>D.C. No.<br>2:11-cv-07098-AB-SH |

| | |
|---|---|
| PERFECT 10, INC., a<br>California corporation,<br>*Plaintiff-Counter-Defendant-<br>Appellant*,<br><br>v.<br><br>GIGANEWS, INC., a Texas<br>corporation; LIVEWIRE<br>SERVICES, INC., a Nevada<br>corporation,<br>*Defendants-Counter-<br>Claimants-Appellees.* | No. 15-55523<br><br>D.C. No.<br>2:11-cv-07098-AB-SH |

PERFECT 10, INC., a
California corporation,
  *Plaintiff-Counter-Defendant-*
                    *Appellee*,


          v.

DR. NORMAN ZADA,
          *Third Party-Appellee*,


GIGANEWS, INC., a Texas
corporation; LIVEWIRE
SERVICES, INC., a Nevada
corporation,
          *Defendants-Counter-*
          *Claimants-Appellants.*

No. 15-56026

D.C. No.
2:11-cv-07098-AB-SH


OPINION

Appeal from the United States District Court
for the Central District of California
Andre Birotte, Jr., District Judge, Presiding

Argued and Submitted December 5, 2016
Pasadena, California

Filed January 23, 2017

Before:  Harry Pregerson, Dorothy W. Nelson,
and John B. Owens, Circuit Judges.

Opinion by Judge D.W. Nelson

# SUMMARY*

## Copyright

The panel affirmed the district court's judgment in favor of the defendants in a copyright case involving the Usenet, an international collection of organizations and individuals whose computers connect to one another and exchange messages posted by Usenet users.

Defendant Giganews, Inc., owns and operates several Usenet servers and provides its subscribers with fee-based access to content stored on its own servers as well as content stored on the servers of other Usenet providers. Defendant Livewire Services, Inc., provides its subscribers with access to the Usenet content stored on Giganews's servers. Plaintiff Perfect 10, Inc., owns the exclusive copyrights to tens of thousands of adult images, many of which have been illegally distributed over Giganews's servers.

The panel affirmed the district court's partial dismissal and partial grant of summary judgment on Perfect 10's direct copyright infringement claim. The panel held that causation, also referred to as "volitional conduct," by the defendant is one of the elements of a prima facie case of direct infringement. The panel held that the volitional conduct requirement was not met on Perfect 10's theories that the defendants directly infringed its display rights and distribution rights. The panel concluded that the evidence showed only that Giganews's actions were akin to passively

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

storing material at the direction of users in order to make that material available to other users upon request, or automatically copying, storing, and transmitting materials upon instigation by others. The volitional conduct requirement also was not met as to the claim that Giganews directly infringed on Perfect 10's right to reproduce by uploading infringing content onto the Usenet or Giganews's servers.

The panel held that Giganews was not liable for contributory copyright infringement because Perfect 10 failed to raise a triable issue of fact as to whether Giganews materially contributed to or induced infringement of Perfect 10's copyrights. The panel held that there were no simple measures available that Giganews failed to take to remove Perfect 10's works from its servers.

The panel affirmed the district court's summary judgment on Perfect 10's vicarious infringement claim. The panel held that Perfect 10 failed to demonstrate a causal link between the infringing activities and a financial benefit to Giganews.

The panel affirmed the district court's award of attorney's fees to the defendants under the Copyright Act and its denial of defendants' request for supplemental fees. The panel also affirmed the district court's denial of defendants' request to amend the judgment to add a judgment debtor as Perfect 10's alter ego.

## COUNSEL

David N. Schultz (argued), Law Offices of David N. Schultz, Los Angeles, California; Eric J. Benink, Krause Kalfayan

Benink & Slavens LLP, San Diego, California; for Plaintiff-Counter-Defendant-Appellant/Cross-Appellee and Third Party-Appellee.

Andrew Phillip Bridges (argued), Jedediah Wakefield, Joseph S. Belichick, and Todd R. Gregorian, Fenwick & West LLP, San Francisco, California, for Defendants-Appellees/Cross-Appellants.

Thomas G. Hentoff (argued) and Nicholas G. Gamse, Williams & Connolly LLP, Washington, D.C.; George M. Borkowski, Recording Industry Association of America Inc., Washington, D.C.; for Amicus Curiae Recording Industry Association of America, Inc.

Kelly A. Woodruff, Deepak Gupta, and Anthony P. Schoenberg, Farella Braun + Martel LLP, San Francisco, California, for Amici Curiae Electronic Frontier Foundation, Public Knowledge, American Library Association, Association of College and Research Libraries, and Association of Research Libraries.

Corynne McSherry, Electronic Frontier Foundation, San Francisco, California, Of Counsel to Amicus Curiae Electronic Frontier Foundation.

Jonathan Band, Policybandwidth, Washington, D.C., Of Counsel to Amici Curiae American Library Association, Association of College and Research Libraries, and Association of Research Libraries.

Charles Duan, Public Knowledge, Washington, D.C., Of Counsel to Amicus Curiae Public Knowledge.

Seth D. Greenstein, Robert S. Schwartz, and Leigh O. LaMartina, Constantine Cannon LLP, Washington, D.C., for Amici Curiae i2Coalition, Internet Association and Computer & Communications Industry Association.

## OPINION

D.W. NELSON, Senior Circuit Judge:

Appellant Perfect 10, Inc. ("Perfect 10" or "P10") challenges the district court's partial dismissal of its direct copyright infringement claim and grant of summary judgment in favor of Appellees Giganews, Inc. ("Giganews") and Livewire Services, Inc. ("Livewire") as to all remaining claims. Perfect 10 also appeals the district court's award of attorney's fees and costs under the Copyright Act. On cross-appeal, Giganews and Livewire contend the district court erred by denying their request for supplemental fees and failing to add Perfect 10's sole shareholder and founder, Norman Zada ("Zada"), to the judgment as Perfect 10's alter ego. For the reasons set forth below, we affirm the district court.

## BACKGROUND

### 1. The Usenet and Appellees' Operations

The heart of this complex copyright dispute revolves around the Usenet (or USENET), "an international collection of organizations and individuals (known as 'peers') whose computers connect to one another and exchange messages posted by USENET users." *Ellison v. Robertson*, 357 F.3d 1072, 1074, n.1 (9th Cir. 2004). "To obtain access to the

USENET, a user must gain access through a commercial
USENET provider, such as Defendant [Giganews], or an
internet service provider." *Arista Records LLC v.
Usenet.com, Inc.*, 633 F. Supp. 2d 124, 130 (S.D.N.Y. 2009).
Giganews owns and operates several Usenet servers and
provides its subscribers with fee-based access to content that
Giganews stores on its own servers as well as content stored
on the servers of other Usenet providers. Unlike Giganews,
Livewire does not own any Usenet servers, but instead
provides its subscribers with access to the Usenet content
stored on Giganews's servers.

The Usenet content offered through Giganews's servers
is almost exclusively user-driven, in that USENET users
upload the majority of the content stored on a USENET
provider's server. This content is posted via text-based
articles to online bulletin boards called newsgroups. Each
article is associated with a unique Message-ID. Giganews
and Livewire contend that the only way to accurately identify
a specific Usenet message is with that Message-ID. Although
these articles are posted as text files, other types of files such
as images, songs, and movies may be encoded into the bodies
of the articles as binary files. Through Giganews's browser
application, known as "Mimo," or "the Mimo Reader," users
can open the binary files, which are then decoded and
displayed in their original format.

By using a "peering process," messages posted on one
Usenet server can automatically propagate to other Usenet
servers, which then propagate the messages to another Usenet
server, and so on. More specifically,

> when an individual user with access to a
> USENET server posts a message to a

> newsgroup, the message is automatically forwarded to all adjacent USENET servers that furnish access to the newsgroup, and it is then propagated to the servers adjacent to those servers, etc.   The messages are temporarily stored on each receiving server, where they are available for review and response by individual users.  The messages are automatically and periodically purged from each system after a time to make room for new messages.  Responses to messages, like the original messages, are automatically distributed to all other computers receiving the newsgroup or forwarded to a moderator in the case of a moderated newsgroup.   The dissemination of messages to USENET servers around the world is an automated process that does not require direct human intervention or review.

*Am. Civil Liberties Union v. Reno*, 929 F. Supp. 824, 835 (E.D. Pa. 1996).  This peering process only occurs after two Usenet access providers enter into peering agreements to accept materials from each other.  The servers are then able to synchronize their information so their content mirrors one another's.  Thus, only after Giganews engages in a peering agreement can its servers exercise any control over the messages copied from other servers.  However, this control is minimal.

As the District Court explained, for example, Giganews servers "compare[] the unique Message-IDs of messages on peer servers to ensure that Giganews does not copy duplicate articles to its servers." *Perfect 10, Inc. v. Giganews, Inc.*, No.

CV-11-07098-AB (SHx), 2014 WL 8628034, at *3 (C.D. Cal. Nov. 14, 2014). Similarly, "if a peer server contains an article with a Message-ID that Giganews has already deleted from its servers," the Giganews servers will not then copy that article. *Id.* In addition, because Giganews is a member of the Internet Watch Foundation, which tracks individual articles by Message-ID or entire newsgroups that contain child pornography, certain articles and newsgroups may automatically be deleted or blocked from peering from Giganews's servers. *Id.*

"Other than setting those basic parameters, Giganews does not select any of the content available on its servers." *Id.* Indeed, "Giganews itself did not post any of the articles at issue in this action . . . to any Usenet server, and all such articles were posted by Usenet users. Nor does Giganews tell any third parties what to upload to the Usenet, including Giganews'[s] Usenet servers." *Id.* (internal citations omitted). Similarly, because Livewire "merely contracts with Giganews for access to [its] servers," Livewire also has no control over the uploaded, downloaded, transmitted, or stored content on Giganews's servers. *Id.* And Livewire itself has neither uploaded material onto the Usenet nor directed anyone else to do so.

## 2. Perfect 10 Images on the Usenet

Perfect 10 owns the exclusive copyrights to tens of thousands of adult images, many of which have been illegally distributed over Giganews's servers. Upon locating infringing materials on those servers, Perfect 10 sent Giganews numerous letters fashioned as takedown notices pursuant to the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, *et seq.* While some of these

notices merely instructed Giganews to "locate all of the infringing messages and images . . . by doing [a] mimo search" for a particular term, others attached screen shots of the Mimo application that displayed posts in which Perfect 10's copyrighted images were distributed. When Perfect 10 sent Giganews machine-readable Message-IDs, Giganews quickly removed those messages from its servers. When Perfect 10 faxed Giganews notices containing illegible Message-IDs, Giganews responded with a letter asking Perfect 10 to provide the Message-IDs in a legible, machine-readable format. Perfect 10 repeatedly declined to do so.

### 3.  Procedural History

On April 28, 2011, Perfect 10 brought suit against Giganews and Livewire in the U.S. District Court for the Central District of California, alleging direct and indirect copyright infringement claims as well as trademark and state law claims. Only the copyright infringement claims are the subject of this appeal.

On March 8, 2013, the district court denied Defendants-Appellees' motion to dismiss Perfect 10's indirect copyright infringement claims against Giganews and granted their motion to dismiss those claims against Livewire with leave to amend. The district court also granted the motion to dismiss the direct copyright infringement claims against both Giganews and Livewire with leave to amend, explaining that direct infringement requires "volitional conduct" and finding that Perfect 10 had not alleged that Appellees "were the direct cause of, or actively engaged in, [such] infringement." *Perfect 10 v. Giganews, Inc.*, No. CV11-07098 AHM (SHx), 2013 WL 2109963, at \*7 (C.D. Cal. Mar. 8, 2013).

On July 10, 2013, the district court granted in part and denied in part Appellees' motion to dismiss Perfect 10's First Amended Complaint ("FAC"). While the district court allowed Perfect 10 to move forward on its direct infringement claim against Livewire and on its direct infringement claim against Giganews on the theory that Giganews violated Perfect 10's exclusive right to reproduce its copyrighted works by itself uploading infringing content, the court dismissed Perfect 10's indirect infringement claims against Livewire.

The parties filed eight separate motions for partial summary judgment. In three separate orders, the district court granted Appellees' motions for summary judgment as to the direct and indirect copyright infringement claims and denied Perfect 10's "mirror-image" motions as moot. In an earlier order, the district court denied Perfect 10's motion for summary judgment in which it argued, among other things, that its takedown notices complied with the DMCA and Appellees were ineligible for safe harbor protection under the DMCA.

On March 24, 2015, upon entering a judgment in favor of Appellees, the district court ordered Perfect 10 to pay $5,213,117.06 in attorney's fees and $424,235.47 in non-taxable costs. Subsequently, the district court denied Appellees' motion to amend the judgment to add Zada as an additional judgment debtor and for a supplemental award of attorney's fees. Perfect 10 timely appealed.

## STANDARD OF REVIEW

We review a district court's grant of summary judgment and grant of a motion to dismiss de novo. *Perfect 10, Inc. v.*

*CCBill LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007); *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 526 (9th Cir. 2008). "The district court's interpretations of the Copyright Act are also reviewed de novo." *CCBill LLC*, 488 F.3d at 1109. "We review a district court's decision to grant or deny attorney's fees under the Copyright Act for abuse of discretion," *CCBill LLC*, 488 F.3d at 1109, "but any elements of legal analysis and statutory interpretation which figure in the district court's decision are reviewable *de novo*," *Fantasy, Inc. v. Fogerty*, 94 F.3d 553, 556 (9th Cir. 1996) ("*Fogerty II*") (citation and quotation marks omitted). Application of the alter ego doctrine is reviewed for clear error. *Towe Antique Ford Found. v. IRS*, 999 F.2d 1387, 1391 (9th Cir. 1993).

## DISCUSSION

### 1. Direct Infringement

Perfect 10 argues the district court erred in concluding that neither Giganews nor Livewire directly infringed Perfect 10's copyrights. We disagree.

#### a. Elements of a Direct Infringement Claim

To establish a prima facie case of direct infringement, a plaintiff "must show ownership of the allegedly infringed material" and "demonstrate that the alleged infringers violated at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001). In addition, direct infringement requires the plaintiff to show causation (also referred to as "volitional conduct") by the

defendant. *See Fox Broad. Co., Inc. v. Dish Network L.L.C.*, 747 F.3d 1060, 1067 (9th Cir. 2013).

We wish to emphasize that the word "volition" in this context does not really mean an "act of willing or choosing" or an "act of deciding," which is how the dictionary defines the term. *Volition*, *Webster's Third New International Dictionary* (1986). Rather, as used by the court in *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1370 (N.D. Cal. 1995), it "simply stands for the unremarkable proposition that proximate causation historically underlines copyright infringement liability no less than other torts." 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 13.08[C][1] (2016) (Matthew Bender, Rev. Ed.); *see also* Dallas T. Bullard, Note, *The Revolution Was Not Televised: Examining Copyright Doctrine After* Aereo, 30 Berkeley Tech. L.J. 899, 922–23 (2015) ("While most courts have focused on the language of 'volitional conduct,' the key analytical weight is best derived from 'causation[,]'" because where it is clear that infringement has occurred, courts must determine "who is close enough to the [infringing] event to be considered the most important cause."). As the district court cogently explained:

> [T]he so-called "volition" element of direct infringement is not a judicially-created element of intent or knowledge; it is a basic requirement of causation. As its name suggests, *direct* liability must be premised on conduct that can reasonably be described as the *direct cause* of the infringement[.]

*Perfect 10, Inc.*, 2014 WL 8628034 at \*7 (emphasis in original).

Contrary to Perfect 10's contention, this requirement of causation remains an element of a direct infringement claim. In *Fox Broadcasting*, we explained that "[i]nfringement of the reproduction right requires copying *by* the defendant, which comprises a requirement that the defendant cause the copying." 747 F.3d at 1067 (internal citation and quotation marks omitted). In using this language, we indicated that causation is an element of a direct infringement claim.

In his dissent in *American Broadcasting Cos., Inc. v. Aereo, Inc.*, Justice Scalia construed our decision in *Fox Broadcasting* as adopting the volitional-conduct requirement, noting that the Supreme Court's "cases are fully consistent with" such a requirement. 134 S. Ct. 2498, 2513 (2014) (Scalia, J., dissenting); *id.* at 2512 (Scalia, J., dissenting) ("Every Court of Appeals to have considered an automated-service provider's direct liability for copyright infringement has adopted [the volitional-conduct requirement.]" (citing *Fox Broad.*, 747 F.3d at 1066–68)). District courts interpreting *Fox Broadcasting* have reached the same conclusion. *See Fox Broad. Co. v. Dish Network LLC*, 160 F. Supp. 3d 1139, 1160 (C.D. Cal. 2015); *Gardner v. CafePress Inc.*, No. 3:13-CV-1108-GPC-JLB, 2014 WL 6890934, at \*3 (S.D. Cal. Dec. 4, 2014) ("There are three elements to a prima facie case of direct infringement: (1) ownership of the allegedly infringed material, (2) violation of at least one exclusive right granted to copyright holders under 17 U.S.C. § 106, and (3) *volitional conduct by the defendant.*" (emphasis added)). Other circuits have adopted the volitional conduct requirement as well. *See Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008)

("[V]olitional conduct is an important element of direct liability . . . ."); *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004) ("[T]he Copyright Act . . . requires *conduct* by a person who causes in some meaningful way an infringement." (emphasis in original)); *Parker v. Google, Inc.*, 242 F. App'x 833, 837 (3d Cir. 2007) (per curiam) ("[T]o state a direct copyright infringement claim, a plaintiff must allege volitional conduct on the part of the defendant.").

The volitional-conduct requirement is consistent with the *Aereo* majority opinion, in which the Supreme Court held that Aereo, a service that streamed broadcast television programming to subscribers over the Internet, "perform[ed] publicly" as defined by the Transmit Clause. 134 S. Ct. at 2503, 2510. First, the *Aereo* Court did not expressly address the volitional-conduct requirement for direct liability under the Copyright Act, nor did it directly dispute or comment on Justice Scalia's explanation of the doctrine. Thus, as one court in the Central District of California subsequently opined, because "[t]he volitional conduct doctrine is a significant and long-standing rule, adopted by all Courts of Appeal to have considered it, . . . it would be folly to presume that *Aereo* categorically jettisoned it by implication." *Fox Broad.*, 160 F. Supp. 3d at 1160.

Second, the *Aereo* Court's analysis can be reconciled with the volitional-conduct requirement. Indeed, the Court distinguished between an entity that "engages in activities like Aereo's," and one that "merely supplies equipment that allows others" to perform or transmit. *Aereo*, 134 S. Ct. at 2504. Further, although the Court held that Aereo was "not just an equipment supplier and that Aereo 'perform[s][,]'" it also noted that "[i]n other cases involving different kinds of service or technology providers, a user's involvement in the

operation of the provider's equipment and selection of the content transmitted may well bear on whether the provider performs within the meaning of the Act." *Id.* at 2507. Thus, "the distinction between active and passive participation remains a central part of the analysis of an alleged infringement." *Fox Broad.*, 160 F. Supp. 3d at 1160. Because *Aereo* did not expressly address the volitional-conduct requirement and the Court's analysis can be reconciled with it, we conclude that the requirement was left intact and that the district court did not err in requiring Perfect 10 to satisfy it.

### b. Perfect 10's Direct Infringement Claim

Only one theory of direct liability as to Giganews survived the pleadings stage. In its July 10, 2013 order on Appellees' motion to dismiss the FAC, the district court rejected Perfect 10's theories that Giganews directly infringed Perfect 10's display rights and distribution rights, concluding that the volitional-conduct requirement was not met. However, the district court denied Appellees' motion as to the claim that Giganews directly infringed on Perfect 10's right to reproduce by uploading infringing content onto the Usenet or Giganews's servers. Subsequently, the district court granted summary judgment on the direct infringement claim, concluding Perfect 10 failed to prove volitional conduct with respect to either Giganews or Livewire. On appeal, Perfect 10 challenges the district court's motion to dismiss and summary judgment orders.

### i. Display Rights

Under the Copyright Act, the owner of a copyright has the exclusive right to display its work. 17 U.S.C. § 106(5).

"[D]isplay" means "to show a copy of [a work], either directly or by means of a film, slide, television image, or any other device or process[.]" *Id.* § 101. Relying primarily on *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), Perfect 10 claims Giganews is directly liable for displaying Perfect 10's images and thumbnails via the Mimo reader. Specifically, Perfect 10 asserts its evidence showed Giganews was not merely a passive host, but rather directly caused the display of Perfect 10 images by making copies of those images and displaying them using its Mimo reader.

As a preliminary matter, we note that the district court concluded Perfect 10's display rights-based direct infringement claim failed at the pleadings stage. Thus, Perfect 10's argument on appeal that the district court "ignored P10's evidence" is irrelevant. Instead, the pertinent question is whether the FAC alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). As the district court correctly concluded, the allegation that Giganews directly infringes Perfect 10's display rights through the Giganews Mimo reader does not state a claim because the fact that "users may use Giganews's reader to display infringing images does not constitute volitional conduct by Giganews." *Perfect 10, Inc. v. Giganews, Inc.*, No. CV-11-7098 ABC (SHx), 2013 WL 3610706, at *2 (C.D. Cal. July 10, 2013). This is because "Mimo is just a reader, a piece of software that allows a user to view an image," and therefore, "[t]o the extent that Mimo is used to view infringing images, this is done by the user." *Id.*

Moreover, even if we were to consider Perfect 10's evidence, the claim would still fail. The sole evidence Perfect 10 points to in support of its argument that Giganews was not

merely a passive host shows only that images and thumbnails were accessed through the Giganews platform. The evidence does not demonstrate that Giganews – as opposed to the user who called up the images – caused the images to be displayed.

Further, our decision in *Amazon* does not render Giganews liable for direct infringement of Perfect 10's display rights. In *Amazon*, there was "no dispute that Google's computers store[d] thumbnail versions of Perfect 10's copyrighted images and communicate[d] copies of those thumbnails to Google's users." *Amazon*, 508 F.3d at 1160. We concluded Perfect 10 established "a prima facie case that Google's communication of its stored thumbnails directly infringe[d] Perfect 10's display right." *Id.* However, citing *CoStar*, we also noted that "[b]ecause Google initiates and controls the storage and communication of these thumbnail images, we do not address whether an entity that merely passively owns and manages an Internet bulletin board or similar system violates a copyright owner's display and distribution rights when the users of the bulletin board or similar system post infringing works." *Id.* at 1160 n.6.

This case falls into the category of cases we declined to address in *Amazon*. The evidence before us shows only that Giganews's actions were akin to "passively storing material at the direction of users in order to make that material available to other users upon request," or automatically copying, storing, and transmitting materials upon instigation by others. *CoStar*, 373 F.3d at 555.

Accordingly, we affirm the district court's dismissal of Perfect 10's display rights-based direct infringement claim.

### ii.  Distribution Rights

Perfect 10 also contends Giganews and Livewire directly violated its exclusive distribution rights under 17 U.S.C. § 106(3), emphasizing that its evidence showed that, at the request of their subscribers, Giganews and Livewire delivered content to download, including copies of Perfect 10 images.

As with Perfect 10's display rights-based theory of direct liability, the district court concluded Perfect 10's distribution rights-based theory as to Giganews failed at the pleadings stage.  Again, the proper inquiry is whether Perfect 10's complaint alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  As the district court correctly held, the allegation "that Giganews directly distributes [Perfect 10's] images when a user requests images from Giganews's servers . . . does not state a claim, because this distribution happens automatically," meaning that "Giganews has not engaged in volitional conduct by which it 'causes' the distribution." *Perfect 10, Inc.*, 2013 WL 3610706, at *3.

However, even if we were to consider the evidence with respect to Giganews, we would still conclude there was no direct infringement of Perfect 10's distribution rights because Perfect 10 failed to show that the distribution does not happen automatically.  Indeed, an analysis of Perfect 10's evidence shows only that users uploaded infringing content onto Giganews servers, not that Giganews played any sort of active role in causing the distribution.

With respect to Livewire, we similarly conclude there was no evidence that Livewire had any direct role in any act of infringement, "let alone any act of infringement relating to

Perfect 10's copyrighted works." *Perfect 10, Inc.*, 2014 WL 8628034, at \*10. First, the evidence Perfect 10 cites – the same evidence cited in support of its distribution rights-based claim against Giganews – does not demonstrate any volitional conduct by Livewire. Again, there is no indication that the distribution does not happen automatically. Second, we are unpersuaded by Perfect 10's argument that Livewire engaged in volitional conduct because it sold access to Giganews servers, including infringing Perfect 10 images, for a monthly fee. As the district court concluded, "the undisputed evidence affirmatively shows Livewire sells access to all the content available on Giganews' servers. There is no evidence that Livewire *sells* any of Perfect 10's copyrighted material." *Id.* (emphasis in original).

Contrary to Perfect 10's assertion, *New York Times Co., Inc. v. Tasini*, 533 U.S. 483 (2001), does not establish that Giganews or Livewire directly violated Perfect 10's distribution rights by selling access to infringing images on Giganews's servers. As the district court noted, the question "is not whether posting content online is a 'distribution' but rather, *even assuming there was a distribution*, whether the *Defendants* can be regarded as having committed the distribution, as opposed to, or in addition to, the third party users who actually uploaded the infringing content onto USENET." *Perfect 10, Inc.*, 2013 WL 2109963, at \*9 n.7; *see also Aereo*, 134 S. Ct. at 2512 n.1 (Scalia, J., dissenting) ("[*Tasini*] dealt with the question whether the defendants' copying was permissible, not whether the defendants were the ones who made the copies.").

Accordingly, we affirm the district court's rejection of Perfect 10's distribution rights-based direct infringement claim.

### iii. Reproduction Rights

With respect to the final purported basis for direct infringement, the district court correctly held that Giganews did not infringe Perfect 10's exclusive reproduction rights under 17 U.S.C. § 106(1). As the Fourth Circuit held, agreeing with the reasoning of *Netcom*, "automatic copying, storage, and transmission of copyrighted materials, when instigated by others, does not render an [Internet service provider] strictly liable for copyright infringement[.]" *CoStar*, 373 F.3d at 555; *see also Netcom*, 907 F. Supp. at 1369 ("Netcom's act of designing or implementing a system that automatically and uniformly creates temporary copies of all data sent through it is not unlike that of the owner of a copying machine who lets the public make copies with it. Although some of the people using the machine may directly infringe copyrights, courts analyze the machine owner's liability under the rubric of contributory infringement, not direct infringement.").

Here, Perfect 10 argues it satisfied the volitional-conduct requirement because Giganews itself instigated the copying, storage, and distribution of Perfect 10's images. We disagree. The evidence Perfect 10 cites does not demonstrate "copying by [Giganews]." *Fox Broad.*, 747 F.3d at 1067; *see also id.* ("[O]perating a system used to make copies at the user's command does not mean that the system operator, rather than the user, caused copies to made."). Perfect 10 provides no evidence showing Giganews exercised control (other than by general operation of a Usenet service); selected any material for upload, download, transmission, or storage; or instigated any copying, storage, or distribution. Accordingly, the district court correctly held there was no triable issue of

material fact as to Perfect 10's claim that Giganews directly infringed Perfect 10's reproduction rights.

In sum, the district court correctly rejected Perfect 10's direct infringement claim because Giganews was not the proximate cause of any infringement in this case. We affirm the district court's motion to dismiss and summary judgment rulings in favor of Appellees as to the direct infringement claim.

## 2.  Contributory Infringement

Perfect 10 also claims Giganews is liable for contributory copyright infringement, "a form of secondary liability with roots in the tort-law concepts of enterprise liability and imputed intent." *Perfect 10, Inc. v. Visa Int'l Serv., Ass'n*, 494 F.3d 788, 794–95 (9th Cir. 2007). "[O]ne contributorily infringes when he (1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement." *Id.* at 795. Because the district court held that Giganews did not know of the alleged infringement at issue in this case, it concluded that Giganews was not liable for contributorily infringing Perfect 10's copyrights without addressing the second prong of the test.

We decline to reach the issue of whether the district court erred in finding that Giganews lacked actual knowledge, because we find that Perfect 10 failed to establish that Giganews materially contributed to or induced infringement of Perfect 10's copyrights. *See Summers v. A. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997) ("The district court's grant of summary judgment may be affirmed if it is supported by any ground in the record, whether or not the district court relied upon that ground.").

### a. Material Contribution to or Inducement of Infringing Activities

As the district court held that Giganews lacked actual knowledge of infringement, it declined to address whether Giganews materially contributed to or induced the infringement at issue. Because we find the issues of material contribution and inducement to be dispositive, it is unnecessary to determine whether the district court correctly found that Giganews lacked knowledge. Even assuming that Perfect 10's takedown notices were sufficient to confer actual knowledge on Giganews, Perfect 10 failed to raise a triable issue of fact as to whether Giganews materially contributed to or induced infringement.

### i. Material Contribution

In the online context, we have held that a "computer system operator" is liable under a material contribution theory of infringement "if it has *actual* knowledge that *specific* infringing material is available using its system, and can take simple measures to prevent further damage to copyrighted works, yet continues to provide access to infringing works." *Amazon*, 508 F.3d at 1172 (internal citations and quotation marks omitted).

According to Perfect 10, Giganews could have used search terms that Perfect 10 recommended in several of its takedown notices to extract machine-readable Message-IDs "in mere seconds" and remove the infringing material. Perfect 10 also claims that other Usenet operators processed Perfect 10 takedown notices that were essentially the same as those sent to Giganews "in as little as one day." According to Giganews, however, absent machine-readable Message-

IDs, there were no simple measures available to remove infringing material. Giganews also disputes whether other Usenet operators were able to take such simple measures based on the takedown notices provided by Perfect 10, and cites the district court's conclusion that "the evidence . . . is undisputed that the only method for consistently identifying a specific Usenet message that Giganews could promptly remove is the post's Message-ID." *Perfect 10, Inc. v. Giganews, Inc.*, No. CV-11-07098 AB SHX, 2014 WL 8628031, at *8 (C.D. Cal. Nov. 14, 2014).

Reviewing this issue de novo, we hold that there were no simple measures available that Giganews failed to take to remove Perfect 10's works from its servers. Giganews presented sufficient evidence that Perfect 10's proposed method for locating infringing messages was onerous and unreasonably complicated. Indeed, Giganews spent more than 20 hours processing 565 Message-IDs from Perfect 10 because they were not machine-readable. Giganews calculates that Perfect 10's method would therefore require 354,000 hours of manual work for every 10 million Message-IDs – the number of Message-IDs that Giganews receives every month. Moreover, the record is clear that when Giganews did receive machine-readable Message-IDs, it immediately processed them and subsequently removed the messages from its servers.

Perfect 10 asserts that its evidence demonstrates the simplicity of its proposed method and that Perfect 10 only learned of the automated Message-ID feature after sending its takedown notices. Perfect 10 does not dispute, however, that Giganews can easily remove infringing content if it is provided with automated Message-IDs, and Perfect 10's evidence only appears to relate to its argument that, by

providing search results and search terms, Giganews could have searched for and found Message-IDs.  Yet, as Giganews argues and the district court agreed, this method is unreliable and burdensome and therefore is not a "reasonable and feasible means" of "prevent[ing] further damage to Perfect 10's copyrighted works." *Amazon*, 508 F.3d at 1172.

Accordingly, although the district court did not address the issue, we conclude that Giganews was not able to take simple measures to remove infringing materials from its servers.  We therefore reject Perfect 10's first theory of contributory infringement liability.

### ii.  Inducement

Perfect 10 has also failed to demonstrate that Giganews induced any infringement of Perfect 10's copyrighted works.  With respect to this alternate theory of contributory infringement liability, the Supreme Court has held that "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd*., 545 U.S. 913, 936–37 (2005).  We have described the inducement theory as having "four elements: (1) the distribution of a device or product, (2) acts of infringement, (3) an object of promoting its use to infringe copyright, and (4) causation." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1032 (9th Cir. 2013).  Based on the record, no reasonable juror could conclude Giganews distributed its product "with the object of promoting its use to infringe copyright." *Cf. Grokster*, 545 U.S. at 936.

Perfect 10 points to entirely inconclusive evidence of any such objective to infringe copyrights. For example, Perfect 10 identifies Giganews's advertising materials, which state that its product "has built-in MP3 and File Locators that search all Giganews newsgroups for music, pictures, and movies without having to download millions of messages." Perfect 10 also points to a web page where a Giganews advertisement appears next to text written by another entity, which states that Giganews "provide[s] an uncensored news feed with up to 20 ssl encrypted connection and over 460 days worth of retention. That is over a years [sic] worth of access to downloadable music, movies and games." However, neither of these advertisements nor any other evidence in the record indicates that Giganews itself promoted its product "with the object" of infringing copyright.

Perfect 10 further argues that Giganews has the object of promoting infringement because it: (1) "offers 25,000 terabytes of copyrighted materials . . . without permission," (2) "continues to commercially exploit the content of known repeat infringers," and (3) "advertises that it does not keep track of subscriber downloads, effectively encouraging infringement." Even if true, none of this conduct suggests that Giganews clearly expressed an intent to promote infringement or took "affirmative steps . . . to foster infringement." *Cf. Grokster*, 545 U.S. at 936–37.

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of Giganews as to Perfect 10's contributory infringement claim.

### 3. Vicarious Infringement

Perfect 10 also argues that the district court erred in granting summary judgment to Giganews on Perfect 10's vicarious infringement claim by (1) applying an incorrect legal standard as to financial benefit, and (2) concluding there was insufficient evidence to find Giganews vicariously liable. We hold that the district court applied the correct legal standard and properly granted summary judgment on the vicarious infringement claim in favor of Giganews.

To prevail on a claim for vicarious infringement, a plaintiff must prove "the defendant has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." *Visa*, 494 F.3d at 802 (footnote omitted). With respect to the second element – the only element the district court addressed – we have explained that a "[f]inancial benefit exists where the availability of infringing material acts as a draw for customers." *Ellison*, 357 F.3d at 1078 (citation and internal quotation marks omitted). Further, as the district court correctly stated, "[t]he size of the 'draw' relative to a defendant's overall business is immaterial." *Perfect 10, Inc.*, 2014 WL 8628031, at *3. Indeed, "[t]he essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of *how substantial* the benefit is in proportion to a defendant's overall profits." *Ellison*, 357 F.3d at 1079.

Therefore, Perfect 10 must demonstrate a causal link between the infringing activities and a financial benefit to Giganews. As the district court noted, "[t]his action is a specific lawsuit by a specific plaintiff against a specific

defendant about specific copyrighted images; it is not a lawsuit against copyright infringement in general on the Usenet." *Perfect 10, Inc.*, 2014 WL 8628031, at *4. Thus, the direct financial benefit prong of the vicarious infringement test "demands more than evidence that customers were 'drawn' to Giganews to obtain access to infringing material in general." *Id.*

In *Ellison*, we rejected a plaintiff's vicarious copyright infringement claim based on the uploading of copyrighted material to a Usenet newsgroup because the plaintiff failed to show the defendant "received a direct financial benefit from the infringement in this case." *Ellison*, 357 F.3d at 1079 n.10. The district court correctly interpreted the references to "*the* infringing activity" and "*the* infringement *in this case*," *id.* (emphasis added), to mean infringement of the plaintiff's copyrighted material, rather than general infringement. This interpretation is supported not only by our repeated use of the definite article ("*the* infringing activity") in *Ellison*, but also by our analysis in that decision. In *Ellison*, after receiving the plaintiff's complaint, AOL blocked access to the specific newsgroup that contained the infringing material at issue in the complaint. *Id.* at 1075. In our discussion of the "direct financial benefit" prong, we concluded "[t]he record lacks evidence that AOL attracted or retained subscriptions because of the infringement or lost subscriptions because of AOL's eventual obstruction of the infringement." *Id.* at 1079. Particularly given AOL's actions upon receipt of the plaintiff's complaint – blocking access to the newsgroup at issue – the phrase "AOL's eventual obstruction of the infringement" logically refers to the infringement of the plaintiff's material, rather than to general copyright infringement. Therefore, contrary to Perfect 10's suggestion, *Ellison* does not compel the Court to hold a defendant

vicariously liable regardless of whether there is any causal link between the infringement of the plaintiff's own copyrighted works and any profit to the service provider.

Perfect 10's view of vicarious infringement is not only inconsistent with *Ellison*, but also difficult to reconcile with Article III's standing requirements. Standing under Article III requires that a plaintiff have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

Here, Perfect 10 argues for a rule that would allow a court to hold Giganews liable under a theory of vicarious liability by showing only that Giganews benefits financially from the infringement of *another's* works, regardless of whether Giganews received any financial benefit from the specific infringement alleged. Such a rule would allow cases to be built on the rights of owners and the actions of users not before the court. At the very least, Perfect 10's proposed rule is in significant tension with Article III's standing requirement. At most, Perfect 10's view runs counter to the requirement that there be a "causal connection between the injury and the conduct complained of[.]" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Accordingly, we reject Perfect 10's formulation of the direct financial benefit inquiry and hold that Perfect 10 was required to provide evidence that customers were drawn to Giganews's services because of the infringing Perfect 10 material at issue. We also conclude that there was no evidence indicating that anyone subscribed to Giganews because of infringing Perfect 10 material. *See Ellison*,

357 F.3d at 1079. Indeed, Perfect 10 provides evidence that suggests only that some subscribers joined Giganews to access infringing material generally; Perfect 10 does not proffer evidence showing that Giganews attracted subscriptions because of the infringing Perfect 10 material. As the district court noted, "[t]hat a Giganews customer may have posted or accessed copyrighted Perfect 10 material as 'an added benefit' to a subscription is insufficient." *Perfect 10, Inc.*, 2014 WL 8628031, at *4; *see Ellison*, 357 F.3d at 1079 ("There are . . . cases in which customers value a service that does not 'act as a draw.' . . . [T]he central question of the 'direct' financial benefit' inquiry . . . is whether the infringing activity constitutes a draw for subscribers, not just an added benefit.").

Because the district court did not err in finding that Giganews did not receive a direct financial benefit from the infringement in this case, "we need not address whether [Giganews] had the right and ability to supervise the infringing conduct." *Ellison*, 357 F.3d at 1079 n.10.

Perfect 10 apparently does not appeal the dismissal of its vicarious infringement claim against Livewire at the pleadings stage. Indeed, Perfect 10 does not mention Livewire in the sections of its brief devoted to its vicarious infringement claim. Nonetheless, to the extent Perfect 10 appeals this dismissal and its argument is not waived, we hold that the district court correctly dismissed the vicarious infringement claim against Livewire because Perfect 10 failed to adequately plead that Livewire exercised the requisite control over the infringing activity of its clients.

## 4. Fee Award

In its fee award order, the district court concluded that Giganews and Livewire were the prevailing parties and found that an award of attorney's fees would serve the purposes of the Copyright Act. The district court also awarded attorney's fees pursuant to California Civil Code § 3344(a) because Appellees successfully defended against Perfect 10's common right of publicity claim. Ultimately, the district court awarded Giganews and Livewire a total of $5,213,117.06 in attorney's fees and $424,235.47 in non-taxable costs. Perfect 10 argues the district court abused its discretion in awarding attorney's fees under the Copyright Act because (1) the fee award was contrary to the purposes of the Act, (2) the district court made erroneous findings of fact regarding the factors outlined in *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) ("*Fogerty I*"), and (3) the total award was not reasonable. We reject these arguments and affirm the fee award.

The Copyright Act provides that, in a copyright action, "the court in its discretion may allow the recovery of full costs by or against any party other than the United States," including "a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505.

"The Supreme Court [has] identified the following non-exclusive list of factors to guide the award or denial of attorney's fees: 'frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case), and the need in particular circumstances to advance considerations of compensation and deterrence.'" *Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir. 2003) (quoting *Fogerty I*, 510 U.S. at 534 n.19).

We have "added as additional considerations: the degree of success obtained, the purposes of the Copyright Act, and whether the chilling effect of attorney's fees may be too great or impose an inequitable burden on an impecunious plaintiff." *Id.* (citing *Fogerty II*, 94 F.3d at 559–60). These factors "may be considered but are not exclusive and need not all be met." *Fogerty II*, 94 F.3d at 558.

We conclude that the district court did not abuse its discretion in awarding fees to Appellees because "the reasons given by the district court . . . are well-founded in the record and are in keeping with the purposes of the Copyright Act." *Id.* at 560. The district court's decision appropriately recognized "the important role played by copyright defendants." *Fogerty I*, 510 U.S. at 532 n.18; *see also Perfect 10, Inc. v. Giganews, Inc.*, No. CV 11-07098-AB (SHx), 2015 WL 1746484, at *3 (C.D. Cal. Mar. 24, 2015). In this vein,

> [b]ecause copyright law ultimately serves the purpose of enriching the general public through access to creative works, it is peculiarly important that the boundaries of copyright law be demarcated as clearly as possible. To that end, defendants who seek to advance a variety of meritorious copyright defenses should be encouraged to litigate them . . . . Thus a successful defense of a copyright infringement action may further the policies of the Copyright Act every bit as much as a successful prosecution of an infringement claim by the holder of a copyright.

*Fogerty I*, 510 U.S. at 527.

Further, we are unpersuaded by Perfect 10's arguments that the district court made clearly erroneous findings of fact regarding the *Fogerty* factors and the other factors articulated by this circuit. The district court did not give undue weight to the degree of success Appellees obtained. Nor did the district court abuse its discretion in finding that Perfect 10 had an improper motivation, that the "objective unreasonableness" factor weighed slightly in Appellees' favor, that considerations of compensation and deterrence weighed in favor of a fee award, and that it would not be inequitable to award attorney's fees to Appellees.

Finally, we conclude that the district court did not abuse its discretion in awarding fees and costs in the total amount of $5,637,352.53. "Although opposing counsel's billing records may be relevant to determining whether the prevailing party spent a reasonable number of hours on the case, those records are not dispositive," and "[a court] has the discretion not to rely on them." *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013). The district court did not abuse its discretion in concluding that the hours Perfect 10 spent litigating the case were not a good barometer of whether Appellees' billed hours were reasonable, nor did it abuse its discretion by finding that there was no basis to impose a 50 percent across-the-board cut.

For the foregoing reasons, we affirm the district court's fee award.

## 5. Supplemental Fee Request

On cross-appeal, Appellees argue that the district court erred in denying their request for supplemental fees. We disagree.

Federal Rule of Civil Procedure 54 provides that a request for attorney's fees "must be made by motion[,] . . . [and] [u]nless a statute or court order provides otherwise, the motion must[] . . . be filed no later than 14 days after the entry of judgment." Fed. R. Civ. P. 54(d)(2)(A)–(B)(i). "Although the 14-day period is not jurisdictional, the failure to comply [with Rule 54] should be sufficient reason to deny the fee motion, absent some compelling showing of good cause." *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 889–90 (9th Cir. 2000) (citation and internal quotation marks omitted) (alteration in original). Further, under Rule 54, motions for attorney's fees must "state the amount sought or provide a fair estimate of it," Fed. R. Civ. P. 54(d)(2)(B)(iii); however, the fee motion need not "be supported at the time of filing with the evidentiary material bearing on the fees." Fed. R. Civ. P. 54, 1993 Advisory Comm. Notes.

Here, the parties do not dispute that the request for supplemental fees was filed after the deadline for motions for attorney's fees set by the court. Instead, Appellees contend their supplemental fee request was timely because, in their original (timely) fee motion, they asked the district court "to set a date for [Appellees] to supplement their request with 'later fees and costs' for inclusion in a final award." We agree with the district court that this amorphous request is inadequate under Rule 54(d)(2)(B)(iii), which at minimum requires a party to "provide a fair estimate" of the amount of fees sought. *See Johnson v. Leading Edge Recovery Sols., L.L.C.*, No. 12-CV-03103-CMA-CBS, 2013 WL 5313255, at *2 (D. Colo. Sept. 23, 2013) ("[T]he Court declines to grant attorney fees because Plaintiff did not include a fair estimate of fees in his initial motion, making the instant motion untimely."); *King v. Midland Credit Mgmt., Inc.*, No. 11-CV-02808-CMA-BNB, 2013 WL 2236934, at *2 (D. Colo. May

21, 2013), *aff'd*, 549 F. App'x 791 (10th Cir. Dec. 10, 2013) ("Although Plaintiff's motion requested 'any additional amounts as determined by the Court', this language is insufficient as it specifies neither the impetus for, nor any calculation of, such 'additional amounts.'" (internal citation omitted)).

We are unpersuaded by Appellees' argument that because "[p]redicting future fees in litigation is notoriously difficult," Appellees could not have provided a "fair estimate" of their future fees in their initial motion. As the district court emphasized, at the time of their original fee motion, Appellees "could have reasonably anticipated that they would file a reply to the fees motion, continue litigating the sanctions motion which was already pending before Magistrate Judge Hillman at the time, seek to add [Norman] Zada to the judgment, and respond to various post-judgment proposals." *Perfect 10, Inc. v. Giganews, Inc.*, No. 734 CV 11-07098-AB SHX, slip op. at 11 (C.D. Cal. June 3, 2015). "Simply put, [Appellees] did not face an insurmountable obstacle in providing an estimate in [their] first [fee] motion." *King v. Midland Credit Mgmt., Inc.*, 549 F. App'x 791, 794 (10th Cir. Dec. 10, 2013).

We also note that, as the district court explained, the vast majority of Appellees' "supplemental fees and expenses . . . were incurred, and therefore known to [Appellees], prior to the district court's" March 24, 2015 order granting in part Appellees' original motion for attorney's fees. *United States v. Eleven Vehicles, Their Equip. & Accessories*, 200 F.3d 203, 210 (3d Cir. 2000). Thus, to the extent that Appellees incurred fees that were unforeseeable or impossible to estimate when they filed their original fee request, they "could and should have supplemented their fee request prior

to the court's decision [on the original fee motion]." *Id.* Appellees did not do so.

In sum, we conclude that the supplemental fee request was untimely and that Appellees failed to make a "compelling showing of good cause" to excuse this untimeliness. *Kona Enters.*, 229 F.3d at 889–90. We affirm the district court's denial of Appellees' supplemental fee request.

## 6.  Alter Ego Liability

Lastly, Appellees argue that the district court erred in denying Appellees' request to amend the judgment to add Norman Zada as Perfect 10's alter ego. We affirm the district court's decision not to add Zada as an additional judgment debtor.

Under Federal Rule of Civil Procedure 69, district courts enforce money judgments in accordance with the procedures of the states where they are located. Fed. R. Civ. P. 69(a)(1). In California, a judgment can be amended to add a nonparty as a judgment debtor if the new party (1) is the alter ego of the old party, and (2) controlled the litigation. *In re Levander*, 180 F.3d 1114, 1121 (9th Cir. 1999). An alter ego relationship is established under California law when "(1) there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased, and (2) an adherence to the fiction of the separate existence of the corporation . . . would sanction a fraud or promote injustice." *S.E.C. v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003) (internal quotation marks and emphasis omitted).

However, mere "[d]ifficulty in enforcing a judgment or collecting a debt does not satisfy" the injustice standard for alter ego liability. *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 539 (2000). "The alter ego doctrine . . . instead affords protection where some conduct *amounting to bad faith* makes it inequitable for the corporate owner to hide behind the corporate form." *Id.* (emphasis added). Insolvency or inadequate capitalization may satisfy this standard "when a corporation is so undercapitalized that it is unable to meet debts that may reasonably be expected to arise in the normal course of business." *Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up Serv., Inc.*, 736 F.2d 516, 525 (9th Cir. 1984) (internal quotation marks omitted); *see also Automotriz del Golfo de California S. A. de C. V. v. Resnick*, 47 Cal. 2d 792, 797 (1957) ("If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege.").

Here, Giganews has not demonstrated that an injustice would result if Zada is not added to the judgment. As the district court explained, in its nearly 20 years of operations, Perfect 10 has always been able to satisfy judgments against it, and the corporation maintained approximately $1.7 million in net assets and equity when it sued Giganews and Livewire in 2011. The district court further noted that Perfect 10's ability to sell some or all of its intellectual property could also help the corporation satisfy any judgment against it. Attempting to undermine these findings, Giganews essentially argues that Perfect 10's admission that it could not currently pay the judgment against it, combined with Zada's history of removing capital from Perfect 10 and the fact that Perfect 10 operates under a risky business model, should have

resulted in alter ego liability for Zada.  But Giganews misses the point.

Nothing in the record suggests that Perfect 10 was so undercapitalized that it could not meet its reasonably expected debts, and particularly in light of Perfect 10's ability to satisfy past judgments against it, there is no evidence of bad faith.  Indeed, this is not a case where a sole shareholder operated a company with little or no assets, nor is this a case where a company was stripped of its assets to shield its sole shareholder from adverse judgments.  And finally, although Giganews argues that the district court erred in referring to the value of Perfect 10's intellectual property as evidence of potential assets with which Perfect 10 could satisfy a judgment against it, the fact remains that Perfect 10 has regularly maintained enough capital to consistently pay its debts for almost 20 years.  Therefore, regardless of the alleged illiquidity of some of Perfect 10's assets, the district court did not clearly err in holding that Perfect 10 is not the "empty corporate shell" that Appellees argue it is. Accordingly, we affirm the district court's order declining to add Zada to the judgment against Perfect 10.

We decline to take judicial notice of certain post-judgment debtor examination transcripts in this case that occurred after the district court ruled on the motion to amend the judgment and after this appeal was filed.  However, even if we were to grant Appellees' request, those transcripts would not alter our conclusion that the district court did not clearly err.

## CONCLUSION

In sum, we conclude the district did not err in dismissing much of Perfect 10's direct infringement claim at the pleadings stage, nor did it err in granting summary judgment in favor of Giganews and Livewire on the direct, vicarious, and contributory infringement claims. We further conclude that the district court did not abuse its discretion in awarding fees to Appellees and denying Appellees' supplemental fee request. Finally, we hold that the district court did not clearly err in refusing to add Zada to the judgment against Perfect 10.

**AFFIRMED.**